UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| EVERYBODY COUNTS, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.: 2:98 CV 97 |
| | ) | |
| NORTHERN INDIANA REGIONAL PLANNING COMMISSION, et al., | ) ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

When people attempt to use public transportation in the City of East Chicago and the bus shows up two hours late, it can be inconvenient. That inconvenience is magnified – and may violate the Americans with Disabilities Act – when the person left waiting in the cold is disabled. This case presents difficult questions as to whether the problems with bus service for the disabled in East Chicago is structural and systemic or sporadic and isolated. Although the Plaintiffs may well be able to prove that the problems are more than insubstantial, they must do so by convincing a jury; they cannot prevail on summary judgment, which is the motion that is presently before the court. [Doc 261]. Because there are unanswered questions of material fact, the Plaintiff's Motion for Summary Judgment is **DENIED**.

**BACKGROUND**

**A.     The Parties**

Plaintiffs Christopher Anthony, Melva Flores, Lorene Jackson, Greg Mitro, Luis Roman, Gordon Sunny and Emas Bennett are individuals with various disabilities who, for purposes of this summary judgment order only, we assume are qualified individuals with disabilities under the ADA. Plaintiff Everybody Counts is a non-profit organization that operates as a Center for

Independent living whose mission is to provide peer counseling, independent living skills training, information, and referral services, and advocacy to individuals with disabilities.

The Plaintiffs sued three municipalities – East Chicago, Hammond and Gary – claiming that the level of transportation services provided to the disabled in those cities was not comparable to the services provided to non-disabled riders in violation of the ADA. The Plaintiffs have also brought claims against various private companies who provided supplemental transportation services to the disabled as sub-contractors to the cities. Finally, Plaintiffs sued the State of Indiana for not adequately overseeing the cities' ADA compliance. Presently before the Court is a motion for summary judgment brought by the Plaintiffs against the City of East Chicago only.[1]

The East Chicago Public Transit ("ECPT") is a municipal entity created by the laws of the State of Indiana and is a "public entity" for purposes of Title II of the ADA. ECPT receives federal transit funds.

**B.     The Fixed Route and Paratransit Systems**

ECPT operates a fixed-route public bus system that is free for riders. Prior to January 1, 1997, ECPT did not have its own complementary paratransit service. Instead, it contracted with outside parties to provide paratransit services free of charge to riders. From March 1, 1994 to

---

[1] The Plaintiffs originally filed their motion on August 2, 2004. Around that time, East Chicago also filed its own motion for summary judgment. [Doc. 266]. On March 7, 2005, the Court vacated both motions (among others) because the parties were involved in protracted settlement discussions, but stated that we would allow the parties to reinstate their motions if attempts at settlement failed. Although settlement was achieved with some of the municipalities, the Plaintiffs and the City of East Chicago could not arrive at an agreement. Consequently, on August 16, 2005, the Court granted the Plaintiffs' request to reinstate its motion against ECPT. ECPT did not move to reinstate its own motion.

February 28, 1997, ECPT contracted with Trade Winds Rehabilitation Center, Inc. ("Trade Winds") to provide complementary paratransit services. Former ECPT director Marina Miklusak testified that ECPT never received any billing from Trade Winds. ECPT also had a contract with Hammond Yellow Taxicab Company ("Hammond Yellow"). Miklusak testified that ECPT had never received any complaints regarding Hammond Yellow's provision of paratransit service. Accordingly, it appears that ECPT not only disputes whether (and when) ECPT actually used these third parties as subcontractors, but also disputes the level and quality of service they provided (if any).[2]

ECPT began providing its own complementary paratransit service in August 1997. Initially, ECPT had only one paratransit van and, therefore, it contracted with Howard Cab, Inc. ("Howard") to provide supplemental service. Howard's contract lasted for two years (until August 1999) and called for Howard to provide service only on an as-needed basis. Former Director Miklusak testified that Howard's services were rarely, if ever, needed and that ECPT never received any complaints about Howard's level of service.

According to Plaintiffs, ECPT also contracted with the Lake County Economic Opportunity Counsel ("LCEOC") to provide supplemental service. LCEOC also had a two-year contract for paratransit services to be used on an as-needed basis. It appears that LCEOC may never have provided services for ECPT because ECPT has no invoices, trip vouchers, trip referral forms, or purchase orders submitted by LCEOC. Indeed, ECPT argues that it never used

---

[2]ECPT also states that it would not be liable for any of Trade Winds shortcomings prior to January 26, 1997 because that is the date by which full compliance with the regulations implementing Title II for public transportation was mandated. Given the significant factual questions below, and because the motion presently before the Court is the *Plaintiffs'* Motion for Summary Judgment, this a legal argument that we need not resolve in this opinion.

LCEOC's services as a paratransit provider. (Plf. Resp. at 5). ECPT eventually acquired a second paratransit van and, thereafter, no longer required the services of Howard and LCEOC.

**C.     The Alleged Violations**

On July 27, 1998, Plaintiffs filed their amended complaint alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq*. and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, *et seq*. The gravamen of Plaintiffs' Amended Complaint (as it relates to ECPT) is that ECPT has not provided Plaintiffs with paratransit service comparable to the service that it offers non-disabled riders.[3]

In their summary judgment briefing, Plaintiffs submitted a list of 13 alleged types of violations. These include:

a. Rides scheduled more than one hour before or after the requested pick-up time window;

b. Riders picked up later than their scheduled pick-up times;

c. Total failure to pick up rider for scheduled trips;

d. Refusals to allow riders to schedule paratransit rides during regular hours of operation;

e. Failure to train personnel to properly operate equipment;

f. Failure to train personnel to provide requested assistance;

g. Failure to train personnel to treat passengers in a courteous manner;

h. Excessive trip lengths;

---

[3] Although this case was originally filed in 1998, the case went through various fits and starts and discovery was not completed until May 2003. During much of 2003 and 2004, the parties continued to represent that they were actively engaging in settlement discussions and, therefore, the Court continued to extend various deadlines.

  i.  Establishing procedures to screen out or discourage qualified individuals with disabilities from using public transportation;

  j.  Failures to provide meaningful public participation in assessment of services;

  k.  Charging fares for paratransit services;

  l.  Failure to provide services comparable to the level of services provided to those without disabilities; and

  m.  Failures in equipment.

(Plf. Memo at 7-9). The Plaintiffs support each of these allegations with anecdotal evidence the majority of which is derived from the experiences of two individuals, Lorene Jackson and Jose Payan.

  Some of these anecdotes involve ECPT's in-house paratransit services. For example, Plaintiff Jose Payan testifies that on three occasions in 2003, he was unable to board ECPT fixed route buses due to inoperable wheelchair lifts. (Payan Aff. at ¶ 4). We note, that consistent with other anecdotes submitted by the Plaintiffs, Payan has not provided dates, locations, or any other details about his encounter with ECPT. He does not describe his interaction with the bus drivers or whether the drivers made any attempt to find him alternate transportation. Instead, he merely states that he was unable to board the ECPT buses due to faulty lifts. Additional information about the encounter is necessary because ECPT provided evidence that if a wheel chair lift on a fixed-route bus is not operational, ECPT policy requires the driver of that bus to radio dispatch for the paratransit van which will be immediately dispatched. (Rosado Aff. at ¶ 6). From Plaintiff Payan's affidavit, we have no idea whether ECPT made any attempts to follow its own policy.

  Other anecdotes involve ECPT's outside providers. For example, Plaintiff Lorene

5

Jackson alleges that she used Trade Winds as a paratransit provider from 1994 until 1997 to travel between her home in East Chicago and the campuses of Purdue University and Indiana University Northwest.  Plaintiff Jackson's description of her denied trips is equally vague.  Moreover, we note that Plaintiff Jackson herself cannot state whether her problematic trips in 1994-96 were provided by Trade Winds as part of a contract with ECPT.  It is unclear whether Plaintiff Jackson believed she was utilizing ECPT services every time she received transportation from Trade Winds.  Indeed, ECPT argues that (in spite of contracts), based on a lack of documentation, LCEOC and Trade Winds did not provide any paratransit services.

At bottom (and without specifying which ones), ECPT concedes to 19 incidents of deficient transportation by ECPT.  (Plf. Resp. at 7).[4]

Plaintiffs also cite to the interrogatory responses of Plaintiff Theresa Torres, a director of Everybody Counts,  in support of each violation.  Here, we note that the majority of Plaintiff Torres's cited responses are not specific to ECPT, but rather refer to "Defendants" – that is, the entire collection of transportation providers sued in this action.  Thus, Plaintiff Torres's responses refer not only to East Chicago, but also to other municipal providers such as Cities of Hammond and Gary as well as contract providers such as Tradewinds, Hammond Yellow Cab, LCEOC, and Howard Cab Service.  Accordingly, the Court cannot discern which complaints are

---

[4] We note that ECPT disputes several anecdotes for legal reasons.  For example, ECPT disputes that it has liability for any incident caused by Trade Winds as its subcontractor which occurred prior to 1997 because the Title II implementing regulations did not call for full compliance until January 26, 1997.  By accepting 19 as the undisputed number of violations for purposes of this summary judgment, we neither accept nor reject any legal arguments.  Instead, as described below, we find that these legal arguments may also entail factual questions to which the Court does not yet have answers.

actually attributable to East Chicago. Indeed, even Plaintiff Torres had trouble identifying problems specific to East Chicago. At her deposition, Torres testified that "East Chicago public transportation, in terms of its provision of paratransit services within the City of East Chicago, we felt, with respect to scheduling rides and getting people where they needed to go on time, were actually pretty good." (Torres Dep. at 851-52). Morever Plaintiff Torres testified, "I don't recall any instances reported with respect to transportation within the City of East Chicago about excessive trip length." (*Id*. at 852).

Finally, Plaintiffs support their allegations with the expert report of Robert Reuters. With respect to ECPT, Mr. Reuter opined that ECPT violated the regulations implementing Title II of the ADA by: a) scheduling rides more than an hour before or after the pick-up time; b) picking up riders later than scheduled pick-up times; c) failing to pick-up riders altogether; d) refusing riders to schedule rides during normal hours of operation; e) failing to train personnel in the use of equipment; f) failing to train personnel in providing assistance; and g) failing to train personnel to treat passengers with disabilities in a respectful and courteous manner. (Reuter Report at 9). In support of his conclusions, Mr. Reuter relied upon discovery responses and various deposition transcripts. The entirety of Mr. Reuter's opinion specifically concerning ECPT is 1.5 pages long.

In response to allegations regarding a lack of training (among other things), ECPT submitted affidavits from its past directors, Marina Miklusak and Francisco Rosado. The directors testified that ECPT's fixed route buses are now wheelchair accessible, that their drivers receive training in the operation of lift equipment as well as sensitivity training to help them properly assist passengers with disabilities. It is unclear whether the same training is provided to

drivers of the paratransit vans.

## DISCUSSION

A.    **Summary Judgment Standard**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Howard v. Lear Corp. EEDS and Interiors*, 234 F.3d 1002, 1004 (7th Cir. 2000); *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 458 (7th Cir. 1999). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.,* 259 F.3d 619, 625 (7th Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). When examining the evidence, the Court should resolve all ambiguities and draw all inferences in favor of the non-moving party. *Haefling v. United Parcel Serv., Inc.,* 169 F.3d 494, 497 (7th Cir. 1999); *Day v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1453 (7th Cir. 1994).

B.    **Title II and the Implementing Regulations**

When Congress passed the ADA in 1990, it found that people suffering from disabilities are a discrete and insular minority who had been systematically discriminated against. *Tennessee v. Lane*, 124 S.Ct. 1978, 1984 (2004). One of the areas of critical concern to Congress was the availability of public transportation to disabled Americans because, without motility, the carrying on of one's life is seriously disrupted. *Id.*; *see also* H.R. REP. NO. 485, pt. 2, at 58 (1990). Consequently, Title II of the ADA provides:

> No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

8

42 U.S.C. § 12132.  In particular, Section 12143 specifically addresses fixed route public transportation and requires public entities that operate fixed route systems to provide paratransit services to individuals with disabilities that are

> sufficient to provide to such individuals a level of service (1) which is comparable to the level of designated public transportation services provided to individuals without disabilities using such system; or (2) in the case of response time, which is comparable, to the extent practicable, to the level of designated public transportation services provided to individuals without disabilities using such system.

42 U.S.C. §12413(a).

Given these broad outlines, Congress instructed the Secretary of Transportation to issue regulations, *see* 42 U.S.C. § 12143(b) & (c), providing minimum service criteria for paratransit service. *See* 48 C.F.R. § 37.121 *et seq*.   First, the DOT issued regulations with respect to response time.  These regulations provide:

> (b) Response Time.  The entity *shall* schedule and provide paratransit service to *any* ADA paratransit eligible person at *any* requested time on a particular day in response to a request for service made the previous day.
>
> * * *
>
> The entity may negotiate pickup times with the individual, but the entity shall not require an ADA paratransit individual to schedule a trip to begin more than one hour before or after the individuals desired departure time.

49 C.F.R. § 37.131(b) (emphasis added).  However, the DOT also recognized that, even with best efforts taken, local paratransit providers might not be able to be 100% effective 100% of the time.  Accordingly, the DOT issued regulations concerning capacity constraints.  These provide:

> (f) Capacity Constraints.  The entity shall not limit the availability of complementary paratransit service to ADA paratransit eligible individuals by any of the following:

9

\* \* \*

> (3) Any operational pattern or practice that significantly limits the availability of service to ADA paratransit eligible persons.

49 C.F.R. § 37.131(f).  The regulations define a "pattern or practice" to include a substantial number of significantly untimely pickups for initial or return trips; substantial numbers of trip denials or missed trips; or substantial numbers of trips with excessive length.  49 C.F.R. § 37.131(f)(3)(i)(A), (B) and (C).  The regulation also contains an exception for factors beyond the provider's control, such as unforeseen weather or traffic conditions.  49 C.F.R. § 37.131(f)(3)(ii).

The interplay between § 37.131(b) and § 37.131(f) is important because a plain reading of the two regulations could put them in conflict with one another. As the Second Circuit noted in *Anderson v. Rochester-Genesee Reg. Trans. Auth.*, 337 F.3d 201 (2nd Cir. 2003), the regulations "are in some tension with each other because [§ 37.131(b)] seemingly required next-day service for every user every time without fail, while [§ 37.131(f)] contemplates a lesser level of service so long as the failures are not substantial in number." *Id.* at 207.  Indeed, the Plaintiffs emphasize the 100% requirement set forth in § 37.131(b) in their analysis of ECPT's alleged shortcomings.  However, § 37.131(b) is not that all-encompassing.

The tension between § 37.131(b) – which seems to require 100% compliance – and § 37.131(f) – which gives the providers a bit more flexibility – was reconciled by the Second Circuit when it held that the § 37.131(b) requires only that "paratransit service provider . . . *plan to meet* 100% of the demand for next-day ride requests." *Id*. at 208 (emphasis added).  Thus, § 37.131(b) does not stand for the proposition that the transportation provider *shall* meet 100% of rider demand 100% of the time, but rather that the transportation provider *must have a plan in place that is designed to meet* 100% of rider demand and a cause of action exists where the

transportation provider has not made such a plan.  *Anderson*, 337 F.3d at 212.

As the government stated in its brief to the Court in *Anderson*, § 37.131(f) was enacted because the government recognized that "even a well conceived paratransit service, designed, funded, and implemented to meet 100% of projected need, may occasionally experience trip denials."  *Id*. at 210 (internal quotations omitted).[5]  § 37.131(f)'s "substantial number" test seeks to separate those trip denials that are the results of occasional plan "misfires" from those trip denials that are indicative of a structural problem in the system – that is, an inadequately implemented paratransit plan.  *Id*. at 212.   As the Court in *Anderson* succinctly put it:

> § 37.131(b) requires paratransit service providers to plan to meet 100% of the demand for next-day ride requests.  Section 37.131(f) recognizes that even well-laid plans may misfire on occasion and permits the denial of an insubstantial number of trips, so long as those denials were not attributable to the design of the paratransit system. And, as necessary, paratransit service providers must modify their plans with the goal of achieving the 100% service level.

*Id*. at 212; *see also Liberty Resources, Inc. v. S.E. Penn. Trans. Auth.*, 155 F. Supp.2d 242, 255 (E.D. Penn. 2001) *vacated*, 54 Fed. Appx. 769 (dismissing defendant's appeal as moot and vacating judgment after compliance with injunction order).

Thus, there is a cause of action for an operational pattern or practice that results in a failure to meet the 100% goal set forth in § 37.131(b).  For example, in *Liberty Resources,* the court found a pattern and practice of violating the ADA existed where the transit authority denied rides to nearly 30,000 ADA-eligible riders in a 13 month period.  Although that

---

[5]  The Court in *Anderson* invited the Department of Transportation to file a brief on the interpretation of the regulations and Department of Justice's Civil Rights Division responded to the invitation on the DOT's behalf.  *Anderson*, 337 F.3d at 206. The *Anderson* Court found the government's interpretation of the governing regulations to be persuasive. *Id*. at 209-10.

amounted to only a 3% denial rate, it was nonetheless found to be a pattern and practice violation in part because the transit authority made no effort to attempt to provide rides to 100% of its riders. *Id*. at 257-58.

Although no court has yet to address the issue, the obvious extension is that untimely trips, as opposed to trips denied due to lack of capacity, may also be permissible where they are infrequent and caused by failures that are not inherent in the provider's plan. This must be so because an untimely trip, while still impermissible, is in many ways less egregious than a trip that is denied outright.

**C.     Application to the Facts**

As the Plaintiffs correctly note, the primary question in this case is whether ECPT created a plan to meet 100% of rider demand.[6] The Plaintiffs also argue that ECPT violated Title II by failing to properly train their personnel. Finally, the Plaintiffs argue that they are entitled to money damages. We take each issue in turn.

**1.     Failure to Develop and/or Implement Paratransit Plan.**

Pointing to the 19 undisputed anecdotes of late, missed, denied, or otherwise insufficient trips, the Plaintiffs conclude that ECPT violated §§ 37.131(b) and 37.131(f) by failing to meet 100% of rider demand. Plaintiffs' analysis stops too short. We must determine both whether ECPT had a plan to timely meet 100% of requested paratransit services as well as whether

---

[6]The Plaintiffs have also referenced §§ 37.131(c) and 37.131(d) in its briefing. § 37.131(c) prohibits ECPT from charging a fare for paratransit services that is more than twice the regular fixed route charge. 49 CFR § 37.131(c).  § 37.131(d) prohibits ECPT from prioritizing paratransit requests based on the riders purpose for the trip. 49 C.F.R. § 37.131(c). The Plaintiffs have not provided evidence (anecdotal or otherwise) demonstrating a violation of either of these regulations.

12

ECPT's failures amount to a substantial pattern or practice that significantly limits the availability of access to comparable public transportation – and are indicative of a failure in the design or implementation of ECPT's plan. We simply do not have the undisputed material facts necessary to undertake this analysis.

At the outset, we note that ECPT has provided some evidence of a plan to provide paratransit services. ECPT now operates its own accessible buses. Before those buses were in service, ECPT contracted with outside service providers to provide paratransit services. These facts alone are enough to survive summary judgment under 37.131(b) as there is a question of fact as to whether ECPT's plan is designed to meet 100% of rider needs.

As to the second question, the § 37.131(f) analysis, the Plaintiffs have not provided the Court with sufficient information to determine whether or not ECPT's alleged failures to meet rider need are "substantial."  First, we note that Plaintiffs anecdotal evidence is very general. The individual plaintiffs cite to "several" instances of  "frequent" and "repeated" violations "sometime in the year 199x".  These general allegations amount to only 19 undisputed deficiencies between 1997 and 2004. Without more information, we cannot conclude that 19 general deficiencies equate to a substantial pattern or practice in violation of Title II.

Second, we note that in contrast to the evidence submitted in *Anderson* and *Liberty Resources*, cases the Plaintiffs cite in support of their motion, we have no statistical evidence before us. For example, in *Liberty Resources*, the parties *stipulated* that in a 13 month period, 29,472 trips were denied out of a total 1,050,770 trips requested. *Liberty Resources*, 155 F. Supp. 2d at 245.  In this case, we have no idea how many total rides were requested, how many rides were denied, or how many rides were deficient for some other reason (late pick-up, missed

13

pick-up or unsafe/untrained circumstances). All we have before us are 19 anecdotes alleging very general violations over a seven year period.[7] This is not sufficient information to determine whether ECPT has engaged in a substantial pattern or practice in violation of Title II.

Finally, we find that the expert report of Robert Reuter is unhelpful as it provides only two pages of extremely generalized conclusions that merely restate the Plaintiffs' allegations. Mr. Reuter provides the Court with no information about what number of failures he deems necessary for a pattern and practice in violation of Title II. Further, while Mr. Reuter opines that ECPT violates the ADA by failing to oversee the entities to whom ECPT subcontracted its paratransit services, he fails to provide the Court with any explanation of the type of oversight that he would expect to find in a compliant entity. Without a basis for comparison, Mr. Reuter's report is little more than a regurgitation of the Plaintiffs' general allegations.

In reviewing the evidence before us, and construing all inferences in favor of the non-moving party, we find there are significant questions of material fact precluding summary judgment. These questions include (but are not limited to):

1) What are the specifics of ECPT's paratransit plan?

2) Was ECPT's plan designed to meet 100% of rider need?

3) When and where did each alleged violation by ECPT actually occur?

4) Which subcontractors actually provided paratransit services on behalf of ECPT?

5) Were the subcontractors acting in their capacities as subcontractors for ECPT

---

[7]We do not mean to limit the Plaintiffs method of proof to broad statistical evidence. However, the Plaintiffs have given us no baseline at all for their 19 anecdotes. We have no idea how many rides each Plaintiff took without incident. Such information would be useful in helping the Court to analyze whether the problematic trips were a substantial number of the requested trips or simply 19 isolated incidents.

       when the Plaintiffs experienced alleged violations?

6) When and where did each violation by an ECPT subcontractor actually occur?

7) How many total violations did ECPT (or its subcontractors) commit between 1997 and the present?

8) How many total paratransit rides did ECPT provide between 1997 and the present?

### 2. Failure to Train

The Plaintiffs also argue that ECPT violated the ADA by failing to properly train its personnel in accordance with 49 C.F.R. § 37.173. The Plaintiff offers only general anecdotal evidence to support their claim, and those anecdotes are rebutted by ECPT. Indeed, ECPT Director Miklusak testified at her deposition that ECPT trains drivers both in the use of equipment as well as sensitivity training. Therefore, at this stage, it is impossible for the court to conclude that the few inadequate trips that the Plaintiffs suffered were the result of a failure of ECPT to train its personnel. We are left with certain questions of fact including, but not limited to:

1) What are the specific of ECPT's equipment training?

2) Are drivers of ECPT's paratransit vans trained in the use of special equipment?

3) Are drivers of ECPT's paratransit vans provided sensitivity training?

4) Assuming they do receive training, is it different in any way from the training that the fixed route drivers receive?

5) Do the Plaintiffs' complaints encompass issues that are covered during training for either the paratransit vans or the fixed route system?

### 3. Plaintiff's Money Damages

Finally, the Plaintiff Everybody Counts claims it is entitled to money damages because

15

the amount of time and resources that it spent fighting ECPT's alleged discrimination could have been better spent providing other services to individuals with disabilities. This may well be true. However, because the Plaintiffs are not entitled to summary judgment on their underlying claims, Everybody Counts' argument for money damages is premature and, therefore, denied.

## CONCLUSION

Because we find substantial issues of material fact with respect to the types of alleged Title II violations and the number and timing of those violations, Plaintiffs' Motion for Summary Judgment against Defendant East Chicago [Doc. 261] is **DENIED**. This matter is set for **telephonic status conference on April 13, 2006 at 1:00 p.m.** Counsel for all parties are ORDERED to participate. The Court will initiate the call. **Counsel shall contact the Court by noon on April 12, 2006** with the name of specific attorneys participating and a telephone number where they will be available for the call.

    **SO ORDERED.**

ENTER: February 3, 2006

                                          S/ Philip P. Simon
                                          PHILIP P. SIMON, JUDGE
                                          UNITED STATES DISTRICT COURT