### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

EVERYBODY COUNTS, INC., et al.,    )
           )
        Plaintiffs,    )
           )
        v.    )      No.: 2:98 CV 97
           )
NORTHERN INDIANA REGIONAL    )
PLANNING COMMISSION, et al.,    )
           )
        Defendants.    )

### OPINION AND ORDER

Title II of the Americans with Disabilities Act (the "ADA") and Section 504 of the Rehabilitation Act both prohibit public entities from discriminating in the provision of transportation services to individuals with disabilities. Plaintiffs, all of whom are disabled, allege they were systematically deprived of access to public transportation in northwest Indiana. When the public entity committing the discrimination is a municipality, the issues presented are relatively straight-forward. By contrast, when the discrimination is allegedly committed by the state, difficult questions arise: Is the state immune from suit pursuant to the Eleventh Amendment or has Congress crafted legislation that properly abrogates this immunity? Can Congress properly condition the acceptance of federal funds on a waiver of this immunity and, if so, under what circumstances? These are the important questions that we address today.

This matter is before the Court on the cross motions for summary judgment by the Plaintiffs and by Defendant Indiana Department of Transportation ("INDOT"). INDOT has moved for summary judgment asserting their Eleventh Amendment Immunity. As to the ADA claim, we find that Congress has not properly abrogated Indiana's Eleventh Amendment immunity and therefore summary judgment is granted to the State of Indiana on the ADA claim.

However, the Plaintiffs' claims may still go forward under the Rehabilitation Act because Indiana, like most states, accepts a significant amount of money from the federal government for the provision of public transportation services and the acceptance of that money was properly conditioned on the waiver of Eleventh Amendment immunity.

The Plaintiffs have also moved for summary judgment claiming that they are entitled to judgment as a matter of law.  The Plaintiffs' theory of the case is that INDOT violated the Rehabilitation Act by distributing grant monies to local and regional entities that discriminate against individuals with disabilities.  However, because there are a host of genuine issues of material fact left unanswered by the Plaintiffs' motion, that motion is denied.

## FACTUAL BACKGROUND

Plaintiffs Christopher Anthony, Melva Flores, Lorene Jackson, Greg Mitro, Luis Roman, Gordon Sunny and Emas Bennett are individuals with various disabilities who, for purposes of this summary judgment order only, we assume are qualified individuals with disabilities under the ADA and who represent a class of similarly situated individuals.  Plaintiff Everybody Counts is a non-profit organization that operates as a Center for Independent living whose mission is to provide peer counseling, independent living skills, training, information, referral services, and advocacy to individuals with disabilities.

The Plaintiffs sued three municipalities – East Chicago, Hammond and Gary – claiming that the level of transportation services provided to the disabled in those cities was not comparable to the services provided to non-disabled riders in violation of the ADA.  The Plaintiffs have also brought claims against TradeWinds and LCEOC as companies who provided supplemental transportation services to the disabled as subcontractors to the cities.  (We

2

collectively refer to East Chicago, Hammond, Gary, TradeWinds and LCEOC as the "Transportation Defendants.")  The Plaintiffs also sued the Northwest Indiana Regional Planning Commission ("NIRPC"), a regional organization that plans and addresses public transportation needs.  Finally, the Plaintiffs brought an action against the State of Indiana for not adequately overseeing the cities' ADA compliance.  It is this latter claim that is presently before the Court.

While the Plaintiffs' claims against the Transportation Defendants are easy to understand because they are the entities that had direct contact with the disabled, their theory of the case against INDOT is not immediately apparent.  INDOT is not a provider of public transportation as are Defendants East Chicago, Hammond, and Gary.  INDOT is not a paratransit service provider as are Defendants Tradewinds and LCEOC.  INDOT is not an entity responsible for planning and addressing public transportation needs as is NIRPC.  Instead, INDOT is the Indiana state agency with responsibility to identify, develop, coordinate, and implement the state's transportation policies, to approve applications for federal transportation grants from funds allocated to the state and to provide pass through funding from the Federal Transit Administration (the "FTA") to metropolitan planning organizations to support regional transportation planning activities (among other things).  INDOT is also responsible for distributing state funds designated for the development of public mass transportation.   Thus, INDOT's role in providing transportation for the disabled is limited to an oversight function and being a pass-through funding entity.

INDOT applies for and receives federal transportation funds (the "Federal Funds") pursuant to the FTA's Metropolitan Planning Program.  INDOT then distributes those funds to Metropolitan Planning Organizations ("MPOs") pursuant to subgrant agreements for use at the

local level.  NIRPC is the MPO for northwest Indiana.  As the original grantee of the federal

funds, INDOT is responsible for ensuring that the MPOs comply with the ADA, the

Rehabilitation Act, and other relevant federal statutes. Thus, in order to pass Federal Funds

through to an MPO, INDOT must certify every two years that the MPO's planning processes

comply with the ADA.  23 C.F.R. § 450.220(a)(4).

According to the Plaintiffs, INDOT passed Federal Funds to NIRPC in at least five

separate years.  As part of these assignments, INDOT certified that NIRPC's planning activities

complied with the ADA and Rehabilitation Act.  Nevertheless, the Plaintiffs assert that NIRPC's

planning processes contain various defects which render them in violation of the ADA and the

Rehabilitation Act.  For example, the Plaintiffs allege that NIRPC:

a.      Does not follow its own policy specifying that notice of all public meetings be
        sent to local media as public service announcements in addition to sending notice
        to specific interested groups and organizations;

b.      Holds planning meetings and times and/or locations that make it difficult for
        consumers to utilize public transportation to attend those meetings;

c.      Fails to have information available in alternative formats such as via a sign-
        language interpreter; and

d.      Conducts meetings that are physically arranged to require individuals with
        disabilities to sit in the back of the room where it is difficult to gather the
        information and/or participate in the meeting.

Citing a 1996 letter that INDOT wrote to NIRPC as part of the annual grant certification process,

the Plaintiffs allege that INDOT was aware of a number of shortfalls in NIRPC's planning

process.  (See Plf. Ex. L).  We note that while most of the shortfalls contained in that 1996 letter

have little, if anything, to do with issues concerning access to public transportation that would

implicate the ADA and Rehabilitation Act, the Plaintiffs did provide evidence that INDOT was

4

at least aware of NIRPC's failure to address public concerns regarding accessibility of meetings held on transportation plan amendments.

The Plaintiffs also allege that NIRPC failed to provide the appropriate oversight function to the municipalities – the Cities of East Chicago, Hammond and Gary – who were operating public transportation systems that did not comply with the ADA.   The Plaintiffs then argue that INDOT, as the entity with federal oversight responsibility, is also responsible because they also did not oversee the offending municipalities.  In other words, the Plaintiffs allege, in a bit of an attenuated way, that INDOT did not properly oversee NIRPC who in turn did not properly oversee the municipalities who were actually violating the ADA in their provision of transportation services.

We note, however, that INDOT presented at least some evidence of oversight programs in place.  For example, Larry Buckell, an INDOT representative, testified that INDOT provides review of NIRPC's use of Federal Funds working in cooperation with the Federal Transit Administration and the Federal Highway Administration.  (Buckell Dep. at 48-56).   Moreover, INDOT received quarterly reports from NIRPC detailing how grant money was spent and how it was utilized.  In those reports NIRPC was required to certify how the monies were being spent and to give reports on how the program was being run.

INDOT also emphasizes that the Plaintiffs' own evidence demonstrates that INDOT made efforts to respond to public criticism.   For example, Plaintiff Theresa Torres stated in her answers to interrogatories that NIRPC established a public participation subcommittee after INDOT criticized NIRPC's processes in response to public complaints of non-compliance.  In addition, the 1996 letter containing the reference to public criticism of NIRPC's planning

meetings expressly conditioned continued funding and approval on NIRPC's correction of that problem. Thus, there is some evidence that the State was doing precisely what it was supposed to do by way of oversight.

The Plaintiffs also allege that INDOT violated the ADA by granting Public Mass Transportation Funds ("PMTF Funds") issued by the State of Indiana to the transportation and paratransit providers named as defendants in this lawsuit.  The Plaintiffs here claim that by providing these grant funds to entities who are, themselves, violating the ADA and the Rehabilitation Act, INDOT is directly violating provisions in the ADA which prohibit public entities from aiding other discriminatory organizations.  *See* 28 C.F.R. § 35.130(b)(1)(v). However, the Plaintiffs have not presented evidence in their motion that the transportation providers are, in fact, violating the ADA, and in denying Plaintiffs Summary Judgment Motion against the City of East Chicago we have found that there are significant questions of fact in that regard. (*See* DE # 416).

**DISCUSSION**

The Plaintiffs bring their claims pursuant to both Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq*., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, *et seq*.  As described above, they allege that INDOT failed to properly oversee the use of Federal Funds by NIRPC and the Transportation Defendants.  They also allege that INDOT violated the ADA by granting PMTF funds to the Transportation Defendants who were, themselves, discriminating against individuals with disabilities.

The bulk of the summary judgment briefing focuses not on the merits of these claims, but rather on whether or not INDOT is entitled to assert its Eleventh Amendment immunity with

6

respect to the Plaintiffs' Title II and Section 504 claims.  Because a state's Eleventh Amendment immunity acts as a bar to an action (rather than a defense), we must resolve these issues before proceeding to our discussion on the merits.  *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 482 (4th Cir. 2005).

## I.      Standard of Review

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See Howard v. Lear Corp. EEDS and Interiors*, 234 F.3d 1002, 1004 (7th Cir. 2000).  A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.,* 259 F.3d 619, 625 (7th Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  When examining the evidence, the Court should resolve all ambiguities and draw all inferences in favor of the non-moving party. *Haefling v. United Parcel Serv., Inc.,* 169 F.3d 494, 497 (7th Cir. 1999); *Day v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1453 (7th Cir. 1994).

## II.     Eleventh Amendment Immunity under Title II of the ADA

Title II prohibits any public entity, including state and local governments and their respective agencies and instrumentalities, from discriminating against qualified persons with disabilities in the provision or operation of public services, programs, or activities. 42 U.S.C. § 12131 and § 12132;  *Tennessee v. Lane*, 451 U.S. 509, 517, 124 S. Ct. 1978, 1984 (2004).  The first issue before us is whether the statutory provision abrogating Eleventh Amendment immunity for suits under Title II of the ADA constitutes a valid use of Congress's authority under § 5 of the Fourteenth Amendment, as applied to the class of cases implicating access to

public transportation.

Ordinarily, the Eleventh Amendment immunizes states from suits brought by citizens of another state, citizens or subjects of any foreign state, and (despite clear language in the Amendment to the contrary) even citizens of the state itself when the suit is unconsented. *Lane*, 541 U.S. at 517, 124 S. Ct. at 1985. However, under certain circumstances, Congress may abrogate this immunity by: 1) unequivocally expressing its intent to abrogate the sovereign immunity in the statute at issue; and 2) acting pursuant to a valid grant of constitutional authority. *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73, 120 S. Ct. 631, 640 (2000).

### A. The Basic Framework for Eleventh Amendment Immunity

In *Tennessee v. Lane*, the Supreme Court recently addressed whether Congress validly abrogated states' Eleventh Amendment immunity with respect to Title II of the ADA at least insofar as it applied to cases implicating the fundamental right of access to the courts. In that case, two plaintiffs brought an action against the state of Tennessee alleging violations of Title II because they were unable to access parts of state courthouses. *Lane*, 541, U.S. at 513-14, 124 S. Ct. at 1982-83. Plaintiff George Lane, a paraplegic, was compelled to answer a set of criminal charges on the second floor of a county courthouse that had no elevator. *Id*. The first time that Lane appeared in court to face his charges, he crawled up two flights of stairs to the second floor courtroom. *Id*. The second time, Lane was jailed after he refused to crawl up the stairs again or to be carried by officers to the courtroom. *Id*. Plaintiff Beverly Jones, also a paraplegic, was not present in Tennessee courthouses as a party to any legal action. *Id*. Instead, she is a court reporter who alleged that she lost both work opportunities and the ability to participate in the judicial process because she was unable to access several county courthouses. Both plaintiffs

8

sought damages and equitable relief.  *Id*.

Tennessee moved to dismiss the lawsuit on the ground that it was barred by the Eleventh Amendment.  *Id*. at 514, 124 S. Ct. at 1983.  The Court began its analysis by holding, as to the first issue – whether Congress unequivocally expressed its intent to abrogate state sovereign immunity in the ADA – with a resounding yes.  *Lane* held with dispatch that Congress spoke with complete clarity on this issue because Title II of the ADA specifically provides that "[a] State shall not be immune under the Eleventh Amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter."  42 U.S.C. § 12202; *Lane*, 541 U.S. at 518, 124 S. Ct. at 1985.  Thus, there is a clear intent to abrogate the states' Eleventh Amendment immunity.

The analysis as to the second question – whether Congress acted pursuant to a valid grant of Congressional authority – is not quite as straight-forward.  Ultimately, the Supreme Court has set forth a three-step inquiry to determine whether Congress's abrogation is appropriate.  First, we must identify the constitutional right at issue.  *Lane*, 541 U.S. at 522, 124 S. Ct. at 1988.  Second, we determine whether a "relevant history and pattern of constitutional violations" exists. *Id*. at 521, 124 S. Ct. at 1987.  Finally, we decide whether the legislative "fix" that Congress suggests is an appropriate response (or, in other words is "congruent and proportional") to the history and pattern of unequal treatment.  *Id*. at 530, 124 S. Ct. at 1992.

This test is necessary to help the courts uphold legislation that appropriately enforces existing Fourteenth Amendment guarantees as opposed to legislation which impermissibly attempts to create new guarantees.  The Supreme Court has repeatedly held that § 5 of the Fourteenth Amendment provides Congress with the power to abrogate a state's sovereign

9

immunity as necessary to enforce the substantive guarantees of the Fourteenth Amendment.  *Id.* at 517-18, 124 S. Ct. at 1985; *Nevada Dept. of Human Res. v. Hibbs*, 538 U.S. 721, 123 S. Ct. 1972 (2003); *City of Boerne v. Flores*, 521 U.S. 507, 117 S. Ct. 2157 (1997);  *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S. Ct. 2666 (1976).  The power to "enforce" the provisions of the Fourteenth Amendment comes from the language of the Amendment itself.  This is a broad power that enables Congress to prevent and deter unconstitutional conduct.  *Lane*, 541 U.S. at 518, 124 S. Ct. at 1985; *see also Hibbs*, 538 U.S. at 727, 123 S. Ct. at 1977 (state employee could bring suit for money damages against state for violating Family Medical Leave Act) .

But the power to "enforce" the provisions of the Fourteenth Amendment – an act which is remedial in nature – is different from the power to determine what constitutes a constitutional violation in the first instance.  The former is well within the limits of Congressional power; the latter is not because it may affect a substantive redefinition of the Constitution.  *City of Boerne*, 521 U.S. at 519, 117 S. Ct. at 2164.  And it is for the Supreme Court – not Congress – to decide the substantive meaning of the Fourteenth Amendment.  *Hibbs*, 538 U.S. at 728, 123 S. Ct. at 1977.

The problem, of course, is deciding which side of the line any given act of Congress falls.  The line is murky and not is easy to recognize.  The Supreme Court has candidly stated that navigating the divide is a difficult task.  *City of Boerne*, 521 U.S. at 519, 117 S. Ct. at 2164; *see also Lane*, 541, U.S. at 520, 124 S.Ct. at 1986.  Nonetheless, the distinction does exist, and the test enunciated by the Supreme Court is whether the § 5 legislation demonstrates "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of Boerne*, 521 U.S. at 520, 117 S. Ct. at 2164.   This test is necessary to ensure

that Congress enforces the Fourteenth Amendment without attempting to reinterpret its guarantees. *Constantine*, 411 F.3d at 485.

The *Lane* court began its analysis by identifying the constitutional rights that Congress sought to enforce when it enacted the legislation at issue. *Lane*, 541 U.S. at 522, 124 S. Ct. at 1988. Specifically, it focused on the right of access to the courts, a fundamental due process right that triggers heightened judicial scrutiny. *Id*. at 523, 124 S. Ct. at 1988. Next, the Court examined the historical questions of whether Congress enacted Title II in response to a pattern of unconstitutional disability discrimination. *Id*. at 524-30, 124 S. Ct. at 1988-92. Only after completing those two predicate steps did the Court examine whether Title II was an appropriate response (i.e. a congruent and proportional response) to the pattern of historic unconstitutional discrimination. *Id*. at 530-34, 124 S. Ct. at 1993-95.

It is important to note that *Lane's* analysis did not consider the validity of Title II as a whole, but specifically narrowed its focus and considered the Eleventh Amendment ramifications of Title II only as it applied "to the class of cases implicating the accessibility of judicial services." *Id*. at 531, 124 S. Ct. at 1993; *see also United States v. Georgia*, __ U.S. __, 126 S.Ct. 877, 883 (2006) (Stevens, J., concurring); *Constantine*, 411 F.3d at 486. This "as applied" approach requires us to consider Title II only as it applies to access to public transportation. *Lane*, 541 U.S. at 551-53, 124 S.Ct. at 2005-06 (Rehnquist, C.J., dissenting).

The fact that the right involved in *Lane* – access to the courts – is a fundamental right was critical to the Court's decision. We know this because *Lane* made a point of distinguishing *Kimel v. Florida Bd. Of Regents*, 528 U.S. 62, 120 S. Ct. 631 (2000) and *Board of Trustees of Univ. Of Ala. v. Garrett*, 531 U.S. 356, 121 S. Ct. 955 (2001) on the grounds that both of those

cases upheld Eleventh Amendment challenges to legislation that targeted classifications subject only to rational-basis review. *Lane*, 541 U.S. 528-29, 124 S.Ct. at 1992. In *Garrett*, for example, the Court concluded that the Eleventh Amendment bars private suits seeking money damages against states for violations of Title I of the ADA. As *Garrett* made clear, a disabled individual has only the right to be free from irrational discrimination based on disability, not the right to be free from all discrimination based on disability. *Garrett*, 531 U.S. at 367, 121 S.Ct. at 964. Thus, if the distinctions drawn are rationally related to a legitimate state interest, then the Equal Protection Clause is not violated. *Id.*

In contrast to *Kimel* and *Garrett*, *Lane* cited with approval to *Hibbs* where the Court previously held that the Eleventh Amendment was not a bar to an action against the states under Family and Medical Leave Act. As the Court in *Lane* noted, the holding in *Hibbs* was predicated in part on the fact that "the FMLA was targeted at sex-based classifications, which are subject to a heightened standard of judicial scrutiny . . ." *Lane*, 541 U.S. at 529, 124 S.Ct. at 1992. Thus, cases where fundamental rights are at stake – access to the courts in *Lane* and being free from sex-based discrimination in *Hibbs* – stand in stark contrast to cases like *Kimel* and *Garrett* where the rights at stake are not fundamental in nature and are subject to the less searching rational basis review. It is, therefore, clear that Congress can (and has) abrogated states' Eleventh Amendment immunity in cases implicating fundamental rights. However, Congress has a much tougher row to hoe when it attempts to abrogate that same immunity in cases implicating only nonfundamental rights.

In sum, the *Lane* Court specifically declined to address the question "whether Title II's duty to accommodate exceeds what the Constitution requires in the class of cases that implicate

only [the] prohibition on irrational discrimination," *Constantine*, 411 F.3d at 486, as opposed to

discrimination that implicates the fundamental right of access to the courts.[1]

## B.        Application of *Lane* to This Case

As mentioned above, by its own terms, *Lane* does not resolve the specific issues in the

case before this Court.  However, the analytical framework the *Lane* Court employed now guides

our analysis.  We must use *Lane's* detailed structure even though previous Seventh Circuit

decisions held that Title II was not a proper use of Congress's § 5 Power.

The Seventh Circuit has held that Title II of the ADA is not valid § 5 legislation.  *Walker*

*v. Snyder*, 213 F.3d 344 (7th Cir. 2000).  However, *Walker* was decided before *Lane* and was not

based on the type of specific, detailed analysis that the Court undertook in *Lane*.  Instead, in

*Walker*, the Seventh Circuit relied on *Erickson v. Bd. of Govs. for N.E. Ill. Univ.*, 207 F.3d 945

(7th Cir. 2000) and *Stevens v. Ill. Dept. of Transp.*, 210 F.3d 732 (7th Cir. 2000),  two prior

decisions in which it found that Title I was not valid § 5 legislation.   Both of those cases

"concluded that Title I of the ADA cannot be based on § 5 to the extent that it requires the

accommodation of disabilities . . . and to the extent that it forbids a state to take account of

disabilities that are rationally related to permissible objects of public action."  *Walker*, 213 F.3d

_____

[1]  It was worth noting that one of the plaintiffs in *Lane* – the court reporter – seems to have been complaining less about her fundamental right to access to the courts, as that right has come to be understood, and more about access to employment opportunities.  By contrast, the other plaintiff clearly was complaining about his fundamental right to access to the courts to answer criminal charges.  While being prevented from answering criminal charges because the courthouse does not comply with the ADA plainly implicates a fundamental right, it is less clear whether access to employment opportunities that happen to be inside a courthouse is in a similar category.  The Supreme Court nonetheless held that the Eleventh Amendment was not a bar to a claim brought by either plaintiff but specifically confined its holding to the class of cases implicating the right of access to the courts.  *Lane*, 541 U.S. at 522, 124 S.Ct. at 1994.

13

at 347.  In coming to this conclusion, the Seventh Circuit assumed that Title II enforced only those rights that were subject to rational basis review under the Equal Protection clause.  *Id*. at 346-47.  The Court then relied on its previous Title I decisions to conclude that there was an insufficient legislative record of disability discrimination and that Title II, therefore, is not congruent and proportional.  *Id*.  Thus, the Court ultimately held that the entirety of Title II is beyond Congress's § 5 authority.  *Id*.

However, in *Lane*, the Supreme Court specifically found that not only does Title II implicate certain fundamental rights, but also directed the courts to determine the congruence and proportionality of the remedies in Title II on a category by category basis.  *Lane*, 541, U.S. at 531 n.18, 124 S. Ct. at 1993 n.18. Thus, the Seventh Circuit opinion in *Walker*, while certainly instructive, is not dispositive since *Lane* came to an opposite result. Thus, we now apply the facts of this case to the framework set out in *Lane*.

### 1.   Constitutional Right at Issue

We begin by identifying the Fourteenth Amendment right that Congress was seeking to enforce when it enacted Title II.  As the *Lane* Court noted, Title II seeks to enforce the Fourteenth Amendment's prohibition on irrational disability discrimination.  *Id*. at 522, 124 S. Ct. at 1988.  However, the Fourteenth Amendment does not forbid all discrimination based on disability.  Classifications based on disability are subject to only minimal scrutiny and, therefore, states are not required to "make special accommodations for the disabled . . .so long as their actions toward such individuals are rational."  *Garrett*, 531 U.S. at 367, 121 S. Ct. at 964.

In this case, the Plaintiffs are seeking equal access to public transportation within the cities of Hammond, Gary, and East Chicago, Indiana.  According to the Plaintiffs, the issue must

be framed as a fundamental right to travel.[2]  (Plaintiff's Resp. at 13).  On the other hand, INDOT

argues that the real issue is not the right to intrastate travel, but rather the right to use public

transportation to achieve that intrastate travel.  INDOT thus frames the issue as "the right to

public service accommodations for those with disabilities."  (INDOT Brief at 10).

Turning first to the Plaintiffs' view, the Supreme Court has not expressly recognized the

right of intrastate travel as a fundamental right.  *Mem. Hosp. v. Maricopa County*, 415 U.S. 250,

255-56, 94 S. Ct. 1076, 1081-82 (1974) (declining to consider whether there is a constitutional

difference between interstate and intrastate travel).  Similarly, the Seventh Circuit has considered

the issue twice and, in both instances, refused to decide whether there is a fundamental right to

intrastate travel.  *Doe v. City of LaFayette*, 377 F.3d 757, 770-71 (7th Cir. 2004);  *Andre v. Bd.*

*of Trust. of Maywood*, 561 F. 2d 48, 53 (7th Cir. 1977) (declining to consider whether "a right to

intrastate travel should be acknowledged").  Some courts have been reluctant to define intrastate

travel as a fundamental right.  *See Willis v. Town of Marshall*, 426 F.3d 251, 265-66 (4th Cir.

2005) (declining to decide whether there is a fundamental right to intrastate travel).   Other

courts have found that there is a fundamental right to intrastate travel. *See Johnson v. City of*

*Cincinnati*, 310 F.3d 484 (6th Cir. 2002) (finding fundamental right to intrastate transportation as

implicated by "drug exclusion zone" ordinance); *Lutz v. City of York*, 899 F.2d 255, 269 (3rd

---

[2]The Plaintiffs also argue that a lack of access to public transportation implicates fundamental rights such as the right to vote and the right to access to the courts.  While we recognize that the ability to access transportation does, in fact, effect the Plaintiffs' ability to take advantage of other rights, the Plaintiffs' characterization of the rights at issue in this case is overly broad.  The Supreme Court's holdings in *Lane* demonstrate that we must narrowly tailor the constitutional right at issue when analyzing Congress's § 5 powers.  Accordingly, we reject the Plaintiffs' attempts to bootstrap broad fundamental rights onto the more particular issues before us in this case.

Cir. 1990) (reviewing an "anti-cruising" ordinance under intermediate scrutiny because it implicated "the newly recognized due process right of localized movement on the public roadways."); *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646 (2nd Cir. 1971) (striking down durational residency requirement as violation of fundamental right to intrastate travel); *cf.*, *Wright v. City of Jackson*, 506 F.2d 900 (5th Cir. 1975) (holding that there is no fundamental constitutional "right to commute").

Nevertheless, taking guidance from the Supreme Court, the Seventh Circuit counseled that in considering substantive due process claims, we must be careful in describing the constitutional right at issue. *Doe*, 377 F.3d at 769. As the court noted, we must make a "careful description of the asserted right [that] must be . . . specific and concrete [and] avoids sweeping generalities." *Id.* To do otherwise could lead to irresponsible decision-making in the murky world of substantive due process by elevating rights to fundamental status. *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S.Ct. 2258, 2267-68 (1997). The same particular description is appropriate when determining whether Title II is valid Section 5 legislation. *Lane*, 541 U.S. at 531 n.18, 124 S. Ct. at 1993 n.18.

In this case, we need not resolve the question of whether there is a fundamental right to intrastate travel because the real issue here is not the right to travel itself. This case is different from typical right to intrastate travel cases cited above involving, for example, residency requirements or anti-cruising laws. What is at issue in this case is the right to a particular mode of transportation – publicly funded transportation. The record before us demonstrates that there is nothing actually preventing the Plaintiffs from traveling from any one area to another. Instead, according to their complaint, they have been denied equal access to public transportation

as a means of accomplishing the travel.  This is a far cry from being unable to travel entirely. *See*

*Doe*, 377 F.3d at 769 (refusing to characterize plaintiff's ban from a public park as a

fundamental right to intrastate travel).

So what constitutional right, then, is implicated by access to public transportation?

Clearly, there is no fundamental constitutional right to public transportation. *Anthony v. Franklin*

*County*, 799 F.2d 681, 686 (11th Cir. 1986).  However, to the extent that an entity chooses to

provide public transportation, it cannot limit that transportation, absent a rational basis, to only

able-bodied riders.  We conclude, therefore, that the constitutional right at issue is the right to be

free from irrational disability discrimination under the Equal Protection Clause particularly as it

relates to public transportation.  This conclusion places squarely before us the very issue that the

Supreme Court reserved in *Lane* of whether Congress can properly abrogate a state's Eleventh

Amendment Immunity under its § 5 powers in the class of cases involving only the right to be

free from irrational disability discrimination. *See Lane*, 541 U.S. at 533 n.20, 124 S.Ct. at 1994,

n.20.

## 2.    History of Discrimination

Having determined the right at issue, we turn to the history of discrimination.  In

analyzing this second prong, the *Lane* court looked at the record supporting Title II as a whole.

*Id*. at 524-28, 124 S. Ct. at 1989-90; *Ass'n. For Disabled Americans v. Florida Int'l Univ*., 405

F.3d 954, 958 (11th Cir. 2005); *Constantine*, 411 F.3d at 487.   The Court reviewed evidence of

discrimination in a wide variety of public services and accommodations including public

services that implicate fundamental or constitutional rights such as access to judicial services,

the penal system, and voting facilities as well as unequal treatment in areas such as public

education, zoning decisions, and mental health facilities.  *Lane*, 541 U.S. at 524-28, 124 S. Ct. at

1989-90.  The Court also looked to Congress's own statement that "discrimination against

individuals with disabilities persists in such critical areas as . . . education, transportation,

communication, recreation, institutionalization, health services, voting, and access to public

services."  *Id*. at 529, 124 S. Ct. at 1992 (quoting 42 U.S.C. § 12101(a)(3)).  Ultimately, the *Lane*

Court found that Congress's statement "together with the extensive record of disability

discrimination that underlies it, makes clear beyond peradventure that inadequate provision of

public services and access to public facilities was an appropriate subject for prophylactic

legislation."  *Lane*, 541 U.S. at 529, 124 S. Ct. 1992.

The *Lane* Court then focused on the cumulative effect of discrimination in a wide variety

of public services, programs and activities and found that Title II satisfied this prong of the

*Boerne* test.  Thus, "after *Lane*, it is settled that Title II was enacted in response to a pattern of

unconstitutional disability discrimination by States and nonstate government entities with respect

to the provision of public services."  *Constantine*, 411 F.3d at 487; *see also Buchanan v. Maine*,

277 F. Supp. 2d 276, 280-81 (D. Maine 2005).   With this directive, we are satisfied that Title II

addressed a history of discrimination in the provision of public services including public

transportation.

### 3.        Congruence and Proportionality

The only remaining question is whether Title II of the ADA is a congruent and

proportional fix given the history of discrimination against the disabled in the category of cases

implicating only the right to be free from irrational disability discrimination in the provision of

public transportation.  We find that it is not.  Title II and its implementing regulations go beyond

18

merely protecting disabled individuals from irrational disability discrimination.  Instead, they

expose states to money damages for violations of the ADA by creating a number of affirmative

obligations that the state can only avoid by establishing undue financial hardship.  This does not

allow the state enough room to make classifications that are rationally related to some legitimate

governmental purpose. *Garrett*, 121 U.S. at 367-68, 121 S.Ct. at 964.

　　The regulations that implement Title II with respect to public transportation require a

wide variety of affirmative actions in the form of "reasonable modifications" which place a

heavy burden on transportation providers.  For example, it is not enough that transportation

providers replace inaccessible vehicles with accessible vehicles over time.  Instead, they must

provide paratransit services or "other special transportation services" for individuals with

disabilities "comparable" to the level of designated public transportation services provided to

individuals without disabilities using such system.  42 U.S.C. § 12143(a);  49 C.F.R. § 37.121.

Moreover, the public entity must provide this special service even if all of its vehicles are

completely accessible in order to accommodate those individuals who have "a specific

impairment-related condition which prevents such individual from traveling to a boarding

location or from a disembarking location on such system."  42 U.S.C. § 12143(c)(1)(A)(iii).

　　The implementing regulations further require the public entity to provide origin to

destination transportation (i.e. point-to-point service) within corridors of a width of 3/4 mile on

each side of the regular fixed route and must provide that transportation *at any requested time* on

a particular day.  49 C.F.R. § 37.131.   Finally, we note that the regulations prohibit a public

entity from charging a fare in excess of twice the fare that would be charged to a person paying a

full fare.  *Id*.  Thus, in municipalities like the City of East Chicago that provide free public

transportation, they may not charge any fare for paratransit services.

In order to escape from these regulations, it is not enough that the public entity has a rational basis for failing to obey.  Instead, they must "demonstrate to the satisfaction of the Secretary that the provision of paratransit and other special transportation services otherwise required under this section would impose an *undue financial burden* on the public entity."  42 U.S.C. §12143(c)(4) (emphasis added); 37 C.F.R. §37.151-153.   The Federal Transit Administration is the sole authority vested with the power to determine which public entities are entitled to this waiver.  37 C.F.R. § 37.153.

In this particular case, the burden on the state is exaggerated by a statutory scheme that essentially attempts to hold the state vicariously liable for disability discrimination even where the state is not the actual entity providing the transportation.   INDOT, as we suspect is the case with most states, is not an actual transportation provider. Therefore, INDOT is not, itself, responsible for undertaking the various modifications imposed by Title II.  Instead, INDOT is merely a funding entity which is prohibited from preventing persons with disabilities from participating in, benefitting from or participating in the planning of various public services.   28 C.F.R. § 35.130.   In particular, the Plaintiffs charge that INDOT has "aid[ed] or perpetuat[ed] discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program."  *Id*. at § 35.130(b)(1)(v).  This regulation purports to place a significant oversight burden on INDOT by making INDOT responsible for any discrimination by any transportation provider to which INDOT has ever administered funds.   The regulation does not contain any specific suggestions

20

as to how INDOT might meet its oversight obligations.  Title II and its implementing regulations require public entities to make modifications such as offering complementary paratransit services in every circumstance unless the public entity can demonstrate undue financial burden.  The state therefore is potentially on the hook if one of the municipalities that it provides funds to is violating the ADA.   To shield itself from liability, the state must somehow ensure that all of its municipalities that provide public transportation are not violating the ADA.   Such an oversight responsibility is plainly burdensome to a state and is not congruent and proportional to the injury being prevented.

In *Lane*, the Supreme Court reviewed Title II with respect to architectural barriers in buildings and found that Title II was a limited remedy.  The *Lane* Court explained that:

> The remedy that Congress chose is nevertheless a limited one. Recognizing that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion, Congress required the States to take reasonable measures to remove architectural and other barriers . . .but Title II does not require States to employ any and all means to make judicial services accessible to persons with disabilities, and it does not require States to compromise their essential eligibility criteria for public programs.

*Lane*, 541 U.S. at 531-32, 124 S. Ct. at 1993.   Nevertheless, this conclusion cannot be taken out of context.  As shown above, in *Lane*, the Supreme Court was dealing with a fundamental right of access to the court.  Thus, in determining whether Congress's response was congruent and proportional to the problem being addressed, we must consider the right being protected.  When the right being protected is a fundamental one, like in *Lane* and *Hibbs*, the decision as to whether the Congressional response is "congruent and proportional" may be different than if the right is not fundamental.  Thus, in *Lane* and *Hibbs*, it was permissible for Congress to go much further to protect the rights at issue.  Accordingly, it is possible for Title II to be a congruent and

21

proportional remedy with respect to the protection of fundamental rights while still being overbroad when the right at issue is the more general prohibition on irrational disability discrimination.

To date, only two Courts have concluded that Title II is a valid exercise of Congress's § 5 power in non-fundamental rights cases.  *See Constantine*, 411 F.3d at 490;  *Ass'n for Disabled Americans v. Florida Int'l Univ.*, 405 F.3d 954, 958-59 (11th Cir. 2005).  Both of these cases dealt with discrimination in the education context.  There has long been recognized a history of pervasive discrimination in the specific area of public education.  *Ass'n for the Disabled*, 405 F.3d at 958 n.12.  While we certainly have a general history of discrimination in this case, we do not have the same specific history of discrimination by states (as opposed to municipalities) in the transportation context that was present in the education context.  Moreover, we note that the Fifth Circuit, in *Pace v. Bogalusa City School Bd.*, 403 F.3d 272 (5th Cir. 2005), specifically declined to rule on the 11th Amendment immunity issue in the education context instead relying on the state's waiver of immunity under Section 504 of the Rehabilitation Act.  In declining to address the issue, the *Pace* court emphasized that the Supreme Court has never recognized a right to education or a freedom from disability discrimination in education as fundamental rights. *Id*. at 287; *Buchanan* 377 F. Supp. 2d at 282.

In contrast, several courts (including *Pace*) have declined to extend *Lane*'s holding to cases involving only the Equal Protection right to be free from irrational disability discrimination.  *See Bill M. V. Neb. Dep't of Health & Human Servs.*, 408 F.3d 1096, 1100 (8th Cir. 2005); *Pace*, 403 F.3d at 287; *Buchanan*, 377 F. Supp. 2d 282.  While one court has gone so far as to say that "the post-*Lane* case law . . .cautions against abrogating a state's sovereign

22

immunity as to Title II under the proportionality/congruence test, unless a plaintiff is asserting a fundamental right," *Buchanan*, 377 F. Supp. 2d at 283, we need not go that far.  While there may be cases where Congress proscribes a congruent and proportional response to the protection of non-fundamental rights, for the reasons outlined above, we do not believe that this is such a case.

In sum, we conclude that Title II is not a congruent and proportional response to the history of disability discrimination in the provision of public transportation to the disabled, a public accommodation to which they have no fundamental right.  The State is therefore entitled to Eleventh Amendment immunity from suit under the ADA as it relates to the provision of public transportation.

### III.    Waiver and Section 504 of the Rehabilitation Act

We turn next to the Plaintiffs' claims under Section 504 of the Rehabilitation Act.   The Seventh Circuit has previously held that "the ADA and the Rehabilitation Act are identical for purposes of [abrogation of Eleventh Amendment immunity under] § 5." *Stanley v. Litscher*, 213 F.3d 340, 344 (7th Cir. 2000).  Accordingly, the Rehabilitation Act may also not be a proper exercise of Congress's § 5 power.  Even so, the Plaintiffs may pursue their claims against INDOT under the Rehabilitation Act because INDOT waived its Eleventh Amendment immunity when it accepted particular federal funds.

Section 504 provides:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

23

29 U.S.C. § 794(a).

The purpose and language of Section 504 is not altogether different from Title II.  Indeed, claims brought under Section 504 are generally analyzed under the same standards as claims brought under the ADA.  *Foley v. City of LaFayette*, 359 F.3d 925, 928 (7th Cir. 2004). However, Section 504 is different from the ADA in that Section 504 "is a condition on the receipt of federal funds."  *Stanley*, 213 F.3d at 344; *see also*, *Bruggeman v. Blagojevich*, 324 F.3d 906, 912 (7th Cir. 2003).   That is, Section 504 does not exist as an independent prohibition on discrimination, but rather it is triggered only when the state decides to accept federal funds for particular programs.

42 U.S.C. § 2000d-7 further conditions a state's receipt of federal money on its waiver of Eleventh Amendment immunity to actions under Section 504 and other federal discrimination statutes, specifically providing:

> *A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973*, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

*Id*. (emphasis added).  The Seventh Circuit has reviewed these statutes and concluded that "a state's decision to accept [financial assistance] is a decision to waive its Eleventh Amendment immunity."  *Bruggeman*, 324 F.3d at 912.

Despite these clear statements from the Seventh Circuit, INDOT argues that it could not have knowingly waived its immunity before the *Walker* decision  because INDOT believed that it was not entitled to immunity.  (INDOT reply at 12-15).  Specifically, INDOT argues that

because the requirements of Title II and Section 504 are materially identical, a failure to comply with Section 504 is also a failure to comply with Title II.  *Foley*, 359 F.3d at 928.  Before the *Walker* decision was issued in 2000, INDOT believed that Title II was a proper abrogation of its Eleventh Amendment Immunity.  Accordingly, INDOT argues that it could not have *knowingly* waived its immunity under Section 504 because it believed that right was already eliminated by Title's II's Eleventh Amendment immunity abrogation.  *See Garcia v. S.U.N.Y. Health Science Cntr. of Brooklyn*, 280 F.3d 98, 114 (2nd Cir. 2001) ("Since . . . the proscriptions of Title II and § 504 are virtually identical, a state accepting conditioned federal funds could not have understood that in doing so it was actually abandoning its sovereign immunity from private damages suits . . . since by all reasonable appearances state sovereign immunity had already been lost.") (internal citations omitted).

Immunity waivers that are part of conditional spending legislation must be both "knowing" and "voluntary."  *College Sav. Bank v. Florida Prepaid Postsecondary Ed. Exp. Bd.*, 527 U.S. 666, 675-75, 119 S. Ct. 2219, 2226 (1999).  The Supreme Court described the "knowing" requirement in *Penhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 101 S. Ct. 1531 (1981), where the Court explained that "if Congress intends to impose a condition on the grant of federal money, it must do so unambiguously."  *Id*. at 17, 101 S. Ct. at 1540.  Thus, they reasoned that "by insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation."  *Id*.

INDOT wants us to graft an "actual knowledge" requirement onto the "knowing" prong of the test.  In *Pace*, 403 F.3d 272, the Fifth Circuit considered and rejected a similar argument. In that case, the Plaintiff brought claims against local authorities and the state of Louisiana under

25

the Individuals with Disabilities Education Act, the ADA and the Rehabilitation Act.  There, too,

Louisiana relied on the Second Circuit's opinion in *Garcia* to argue that because Louisiana

reasonably believed that its Eleventh Amendment Immunity was already abrogated, it did not

and could not *knowingly* waive any retained immunity by accepting federal funds.  *Id*. at 283.

The Fifth Circuit rejected this argument and the logic of *Garcia* as well:

> *Garcia's* approach employs the wrong jurisprudential test because it
> distorts what is necessary to show knowledge for Spending Clause
> waivers.  Analytically, the "knowledge" question that we ask when
> we undertake the Spending Clause waiver inquiry is coextensive with
> the clear-statement rule; for, when a state *actually* accepts funds that
> are clearly conditioned on a waiver of Eleventh Amendment
> immunity, it is held objectively to "know" that it is accepting *all*
> clearly stated conditions.  That it might not "know" subjectively
> whether it had any immunity to waive by agreeing to those conditions
> is wholly irrelevant.

*Id*. at 284 (emphasis in original).

We concur with this analysis.  If we were to require a subjective test (as INDOT and

*Garcia* suggest), Congress could never create a clear statement because it would always be

subject to agency interpretation.   In order to inject a level of certainty to the waiver analysis, the

objective clear-statement test *must* be coterminous with the waiver analysis.

Thus, what INDOT *actually* knew (or believed) at the time it accepted federal funds is

not relevant to our analysis.  Instead, we ask whether Congress clearly stated the waiver

requirement in the legislation at issue.  In this instance, Congress could not have stated it more

clearly: "A State shall not be immune under the Eleventh Amendment of the Constitution of the

United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of

1973 . . ." 42 U.S.C. § 2000d-7.   We hold that INDOT waived its Eleventh Amendment

immunity for violations of Section 504  when it accepted federal funds.

26

IV.    **Private Right of Action under Title II and Section 504**

Finally, the parties dispute whether the Plaintiffs are entitled to relief under Section 504 and Title II on the merits.   INDOT argues that even if we find that it is not immune from the Plaintiffs' Title II and Section 504 claims, INDOT is still entitled to summary judgment because the Plaintiffs have not asserted a claim based on any direct actions by INDOT and, therefore, have limited remedies (if any).   In contrast, the Plaintiffs argue that not only are they entitled to relief under these sections, but they are also entitled to summary judgment on the issue.   Neither party is correct.

Both Title II and Section 504 are enforceable through private causes of action.  *Barnes v. Gorman*, 536 U.S. 181, 185, 122 S. Ct. 2097, 2100 (2002).  A private party seeking to enforce Title II and Section 504 is clearly entitled to injunctive relief. *United States v. Georgia*, __ U.S. __, 126 S. Ct. 877, 882 (2006).  Moreover, in certain situations, the private party may also be entitled to compensatory damages.  *Barnes*, 536 U.S. at 186-87, 122 S. Ct. at 2100-02; *Garrett v. Chicago Sch. Reform Bd. Of Trust.*, 1996 WL 411319 at *4 (N.D. Ill. July 19, 1996).

The rights, remedies, and procedures available under both Title II and Section 504 are "coextensive with the remedies available in a private cause of action brought under Title VI of the Civil Right Act . . . which prohibits racial discrimination in federally funded programs and activities." *Barnes*, 536 U.S. at 185, 122 S. Ct. at 2100; *see also*, 42 U.S.C. §12133; 29 U.S.C. § 505(a)(2).   Title VI is spending clause legislation which has been repeatedly characterized "as a contract: in return for federal funds, the [recipients] agree to comply with federally imposed sanctions." *Barnes*, 536 U.S. at 185-86, 122 S. Ct. at 2100-01.   Thus, compensatory (i.e. monetary) damages are available in private suits under Title VI (and, thus, Title II and Section

504) where a public entity has committed "intentional conduct that violates the clear terms of the relevant statute." *Id*. at 187, 122 S. Ct. at 2101.   This standard has also been characterized as one of "deliberate indifference." *Davis v. Monroe Co. Bd. of Ed.*, 526 U.S. 629, 642-43, 119 S. Ct. 1661, 1671 (1999) (discussing Title IX and holding that a funding recipient intentionally violates Spending Clause legislation "where the recipient is deliberately indifferent to known acts of . . . discrimination").

In this case, the Plaintiffs have alleged a direct cause of action against INDOT. Specifically, they allege that INDOT failed to implement any system to oversee NIRPC, one of its federal subgrantees.  As a result, the Plaintiffs argue that INDOT was deliberately indifferent to NIRPC's discriminatory practices.   Moreover, the Plaintiffs allege that INDOT continued to certify grants on NIRPC's behalf in spite of known discriminatory practices.  Both of these claims, if proven, could support causes of action under the "deliberately indifferent" standard and INDOT is not entitled to summary judgment on this issue.

Nor are the Plaintiffs entitled to summary judgment.  There are simply too many material questions of fact relating to INDOT's oversight program.   For example, the Plaintiffs focus almost exclusively on INDOT's knowledge of NIRPC's planning process and state that INDOT continued to pass funding to NIRPC in spite of these known defects.  However, INDOT denies knowledge of any major problems with NIRPC's planning process (noting that the Plaintiffs cite to only one 1996 letter to support their claims).  Moreover, INDOT points out that when it became aware of NIRPC's problems, INDOT conditioned additional certifications and funding on NIRPC's ability to correct these problems.  Indeed, the Plaintiffs even admit that NIRPC formed a subcommittee on its planning process after INDOT criticized NIRPC's activities.

There are also significant fact questions surrounding exactly what oversight INDOT had in place to monitor the use of the Federal Funds and the PMTF Funds.  The Plaintiffs allege that INDOT had no effective monitoring in place.  However, INDOT provided evidence that it participated in a review process together with the Federal Transit Administration and the Federal Highway Administration.  The memorandum and quarterly reports that the Plaintiffs submitted as evidence also demonstrate that INDOT was performing some monitoring – although the amount of that monitoring remains unclear.

Finally, in order for INDOT to have violated the ADA by aiding or perpetuating discrimination by providing assistance to an agency that discriminates on the basis of disability, there must first be proof that the agencies receiving grant money are actually discriminating against individuals with disabilities.  As we found in denying summary judgment to the Plaintiffs in their claims against East Chicago, we do not have that proof before us – at least not so much proof as to be able to say that discrimination is occurring as a matter of law.

Accordingly, we find that there are significant questions of material fact which include, but are not limited to:

a.   What oversight programming, if any, does INDOT have in place to monitor NIRPC and other MPOs?

b.   Was NIRPC's planning process actually discriminatory?

c.   If so, did INDOT have knowledge of NIRPC's discriminatory practices?

d.   What steps, if any, did INDOT take to remedy any of NIRPC's discriminatory practices prior to approving additional funding?

e.   Were the Transportation Defendants discriminating against individuals with disabilities?

f.   Did INDOT have any monitoring program in place to oversee recipients of PMTF

29

Funds?

g.      Was INDOT aware of discrimination at the local public transportation level?

h.      If so, what, if anything did INDOT do about it before distributing additional PMTF Funds to these local discriminators?

Because we find that the Plaintiffs may obtain both injunctive and monetary relief from INDOT in this lawsuit, INDOT's motion for summary judgment on the merits is **DENIED**. Moreover, because there are remaining questions of material fact, the Plaintiffs' motion for summary judgment is also **DENIED**.

## V.      **Individual Plaintiff Torres's Defamation Claim**

Separately, Plaintiff Theresa Torres also brought a claim for defamation alleging that representatives of various defendants made derogatory statements about Plaintiff Torres in relation to her advocacy efforts at public hearings before the filing of this action.  INDOT argues that to the extent this claim targets INDOT, it is barred by the provisions of the Indiana Tort Claims Act.  Plaintiff Torres does not address this portion of the summary judgment either factually or legally in the Plaintiffs' response.   We, therefore, find that Plaintiff Torres abandoned this claim with respect to INDOT.  *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 n.2 (7th Cir. 1996) (finding that the plaintiff abandoned his FMLA claim after failing to respond to arguments regarding FMLA claim in the defendant's motion for summary judgment).

## CONCLUSION

INDOT"s Motion for Summary Judgment [Doc. 227] is **GRANTED in part and DENIED in part**.  Because we find that individual plaintiff Theresa Torres failed to respond to arguments addressing her defamation claim insofar as it applies to INDOT, INDOT's motion for

summary judgment is granted as to the defamation claim.  INDOT's motion for summary

judgment is also granted as to the Plaintiffs' Title II claims against INDOT because Congress did

not properly abrogate the states' Eleventh Amendment Immunity in Title II of the ADA at least

insofar as the ADA applies to equal access to public transportation.  However, because INDOT

waived any Eleventh Amendment immunity it retained for violations of Section 504 of the

Rehabilitation Act, INDOT's Motion for Summary Judgment is denied as to the Plaintiffs'

Section 504 claims.  Further, because we find substantial issues of material fact with respect to

Plaintiffs claims against INDOT, Plaintiffs' Motion for Summary Judgment against INDOT

[Doc. 223] is **DENIED**.  As previously ordered on February 3, 2006, this matter is set for

**telephonic status conference on April 13, 2006 at 1:00 p.m.**  Counsel for all parties are

**ORDERED** to participate.   The Court will initiate the call.  **Counsel shall contact the Court**

**by noon on April 12, 2006** with the name of specific attorneys participating and a telephone

number where they will be available for the call.


      **SO ORDERED.**

ENTER: March 30, 2006


      s/ Philip P. Simon
      PHILIP P. SIMON, JUDGE
      UNITED STATES DISTRICT COURT